**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-02005-CMA-MJW

MICHELE KENNETT, individually and on behalf
of the Proposed Colorado Rule 23 Class,

      Plaintiff,

v.

BAYADA HOME HEALTH CARE, INC.,

      Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

---

This case concerns the scope of the so-called "companion" exemption to Colorado state law's overtime protections. In particular, it requires the Court to decide whether the exemption – which applies to workers who provide home health care services for the elderly, ill, or disabled – applies solely to those workers who are hired directly by home care recipients and their families, or if the exemption also encompasses the employees of third-party agencies.

Plaintiff Michele Kennett, who worked as a home health aide for Defendant Bayada Health Care, Inc. (Bayada), asserts claims under Colorado state law for unpaid overtime wages, both on her own behalf and on behalf of a proposed Rule 23 class. In its Motion for Summary Judgment, Defendant contends that Ms. Kennett is barred from seeking overtime pay by virtue of the "companion" exemption. (Doc. # 30.) As detailed

below, because the Court concludes that the only sound interpretation of that exemption requires that the "companion" employee is employed directly by the household or family for which the employee is providing services, it denies Defendant's Motion and grants Plaintiff's Cross-Motion on Defendant's Exemption Defense.

## I. <u>BACKGROUND</u>[1]

Bayada is a for-profit home health care company, providing in-home nursing, rehabilitative, therapeutic, hospice, and other assistive services to clients with cognitive difficulties, physical disabilities, and/or chronic illnesses. (Doc. # 32, ¶¶ 1, 12.) Ms. Kennett, a Certified Nursing Assistant (CNA), was hired as a "Home Health Aide" (HHA) by Bayada in January of 2012 and worked in this capacity until August of 2013. (*Id.*, ¶ 3.) The parties disagree about the actual number of overtime hours Plaintiff worked as an HHA, but it is undisputed that Bayada did not pay Bennett an overtime premium; rather, it paid her $10.00 an hour for all of the hours she worked, including this $10.00 per hour "straight time rate" for hours worked in excess of 40 hours in one work week or in excess of 12 hours in one work day. (Doc. # 32, ¶ 16.)

Before beginning work with Bayada, Ms. Kennett completed an orientation training at Bayada's offices that included a 90-day introductory period of evaluation. (Doc. # 32, ¶ 3, Doc. 32-4 at 10.) She also signed an "Agreement of Standards" form containing a non-compete clause. (Doc. # 32-5 at 7.) That clause provided that she would not "for any reason, seek or accept employment from or directly/indirectly provide

---

[1] Unless otherwise noted, these facts are deemed undisputed. Additionally, the Court sets forth facts only as necessary to address the arguments presented in the parties' respective Motions for Summary Judgment.

services to any client of BAYADA NURSES for whom I have rendered services during my employment with the company and for a period of one hundred eighty (180) days after separation of my employment." (*Id.*)

Before an HHA provided services to a client, one of Bayada's "Clinical Managers" (typically a Registered Nurse, who also served as the HHA's direct supervisor), met with the client and/or the client's family to complete a "Home Health Care Plan," setting forth the particular services to be provided by the HHA. (Doc. # 32, ¶ 7.) The Home Health Care Plan provided a set "menu" of services that clients could select from the following categories:

1) "Personal Care" (such as assistance with "bathing" and "showering");
2) "Toileting/Elimination" (such as changing a "Urinal" or "Bed Pan" and "Incontinence Care");
3) "Nutrition" (such as "Prepare Meal" and "Assist with Feed[ing]");
4) "Precautions" (including "Fall [prevention]," "Choking [prevention]");
5) "Mobility" (including "Assisting with Transfer…[to a] Walker, Wheelchair [and] Cane");
6) "Special Instructions/Tasks" (such as monitoring "vital signs" and "weight"); and
7) "Support Services" (including "Chang[ing] Linens," and "Bed Making").

(*Id.*) If the client wished to make changes to the services the HHA was providing, or if the HHA felt that changes were appropriate, the HHA did not have discretion to make such changes to the "Home Health Care Plan." (Doc. # 32, ¶ 8.) Rather, those changes needed to be discussed with, and approved by, the Clinical Manager. (*Id.*)

HHAs were typically CNAs – not Licensed Practical Nurses or Registered Nurses. (Doc. # 29, ¶¶ 10-12.) As such, they were not permitted to administer medications directly, but could remind clients to take their own medications. (Doc. ##

32, ¶ 12, 32-4 at 49, 32-5 at 1.)  Similarly, HHAs were not permitted to adjust their clients' oxygen tanks, but could monitor their vital signs, including oxygen levels and blood pressure.  (Doc. ## 32, ¶ 12, 32-4 at 49.)  Specifically, HHAs were to "observe [oxygen] for safety and maintenance issues only[,] i.e.[,] check for correct [oxygen] liter flow, application," but any problems were to be "reported to Clinical Manager, RN Case Manager or RN designee."  (Doc. # 32-4 at 49.)  Bayada's policies also set forth a relatively long list of other, specific medical procedures which HHAs were not permitted to perform – from nail cutting, wound irrigation, and performing a "finger stick" for a blood glucose test, to managing IVs and performing catheter insertions or irrigations. (Doc. # 32-4 at 49.)

According to Bayada's official policies, while working at a client's home, HHAs were expected to wear a name tag identifying them as a Bayada employee, and they were also prohibited from wearing denim jeans, shorts, capris, stretch pants, sandals, flip flops, or high heels.  (Doc. # 32-3 at 47; 32-4 at 10.)  The Bayada dress code further provided that "fingernails should be short and well-tended; hair should be clean and controlled," and "little or no jewelry or cologne [should be] worn."  (Doc. # 32-3 at 47.) Additionally, HHAs were instructed not to contact their clients directly ("it is not appropriate for field employees to call clients to tell them that they will be late or are unable to make it to work.")  (*Id.* at 47.)  Instead, HHAs were instructed to contact their supervisor (the Clinical Manager) in the event of illness or emergency, and he or she would then notify the client that the HHA was going to be late or absent.  (*Id.* at 12, 47.) Similarly, clients were not to contact their HHA directly; rather, they were instructed to

contact the Clinical Manager with any questions or concerns.  (Doc. # 32, ¶ 19.) [2]  If an

HHA wished to change his or her work hours, he or she was required first to obtain

approval from the Clinical Manager – not the client – or he or she could risk disciplinary

action.  (*Id.*, ¶ 15.)

HHAs and the client jointly completed and signed a "Home Health Aide Time and

Activity Report" ("Time and Activity Report") detailing the dates, times, and services

performed by the HHA on a weekly basis. [3]  (Doc. # 32, ¶ 10.)  The HHA submitted the

completed Time and Activity Report to Defendant's office each week, and the Reports

were used to generate the HHA's paycheck.  (*Id.*)  Additionally, Bayada produced and

maintained all employment records for HHAs, including earning statements, personnel

files, tax records, medical screenings, and performance evaluations.  (*Id.*, ¶ 23.)  Clients

were permitted to change their assigned HHA for any reason, at any time, by contacting

the Clinic Manager, who would change the HHA assigned to the client.  (Doc. # 32, ¶

20.)  Clients were not permitted to terminate the HHA's employment with Bayada;

rather, another HHA would be assigned to any client who asked for a reassignment, and

---

[2] Defendant asserts that, in practice, Bayada's clients and the HHAs did not always adhere to its uniform and scheduling policies.  Specifically, "notwithstanding the employee manual, [clients] had control over what Plaintiff and the Homecare Workers could wear."  (Doc. # 35 at 1-2.) Additionally, "[a]lthough Bayada's policies express a preference for consumer communication – both to and from the consumer – regarding scheduling to go through the Clinical Manager, often, such communication would occur directly between the [client] and the Homecare Worker." (*Id.*)

[3] The "Time and Activity Report" also contained a reiteration of the non-compete clause, stating: "I agree not to work directly or indirectly for the client named on the front of this form, or for any other former client for 180 days following separation from BAYADA Home Health Care."  (Doc. # 32, ¶ 11.)

the HHA "then may – or may not – have been reassigned to another" client.  (*Id.,* Doc. # 30 at 26.)

In September of 2014, this Court promulgated a scheduling order providing that this case would transpire in two phases.  In the first phase, the parties would focus discovery on Defendant's overtime exemption defense, culminating in the instant Motions for Summary Judgment.  (Doc. # 17 at 7.)  If necessary, in the second phase, the parties would focus discovery on facts relating to class certification and damages.  (*Id.*)

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law.  *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231–32 (10th Cir. 2001).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee, Okl.,* 119 F.3d 837, 839 (10th Cir. 1997).  In reviewing motions for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*  However, conclusory statements based merely on conjecture, speculation, or subjective beliefs do not constitute competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.  *Id.*  In

attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

## III.  ANALYSIS

Federal law has long exempted employees who provide "companionship services" to elderly or infirm individuals from the Fair Labor Standards Act's (FLSA's) overtime protections. 29 U.S.C. § 213(a)(15) (2014);[4] *Home Care Ass'n of Am. v. Weil*, No. 15-5018, 2015 WL 4978980, at *2–*3 (D.C. Cir. Aug. 21, 2015) (discussing the history of the exemption). The "Third Party Employment" provision of the FLSA's

---

[4] Specifically, 29 U.S.C. § 213(a)(15) (2014) exempts "any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)."

implementing regulations specifically states that "companion" employees may not seek

overtime pay even when such an employee is employed directly by a third-party

employer, rather than a family or household:

> Employees who are engaged in providing companionship services,
> as defined in § 552.6, **and who are employed by an employer or
> agency other than the family or household using their services**, are
> exempt from the Act's minimum wage and overtime pay requirements by
> virtue of section 13(a)(15).  Assigning such an employee to more than one
> household or family in the same workweek would not defeat the
> exemption for that workweek, provided that the services rendered during
> each assignment come within the definition of companionship services.

29 C.F.R. § 552.109 (2014) (emphasis added).[5]  The question presented by this

case is whether Colorado state law treats "companion" employees differently

than federal law for purposes of overtime protection.  The specific issue

presented by the parties' respective motions for summary judgment is relatively

simple, but one of first impression:[6] are HHAs like Ms. Kennett exempt from

overtime protections under the Colorado Department of Labor's Minimum Wage

Order, as "companion" employees?

---

[5] In October of 2013, the United States Department of Labor issued regulations that significantly narrowed the definition of "companionship services," effectively ensuring that most employees providing home health care assistance to elderly or disabled persons would no longer qualify for the third-party employment "companionship" exemption.  29 C.F.R. § 552.6(b) (2015); 29 C.F.R. 552.109 (2015).  These regulations were recently upheld by the United States Court of Appeals, District of Columbia Circuit.  *See Home Care Ass'n of Am. v. Weil*, No. 15-5018, 2015 WL 4978980, at *9 (D.C. Cir. Aug. 21, 2015).  At this juncture, Plaintiff's Complaint contains no federal law claims.

[6] The parties indicate that this is an issue of first impression; likewise, the Court has not found case law addressing this issue.  *Scott v. Home Instead, Inc.*, No. 14-CV-00833-MSK-CBS, 2014 WL 5812331, at *3 (D. Colo. Nov. 10, 2014), which implicated the "companion" exemption but dealt with a different issue ("whether Colorado law allows 'companion' employees to perform general household work"), settled after Chief Judge Krieger denied the plaintiff's motion for class certification without prejudice.

The Colorado "Minimum Wages of Workers Act" charges the Director of the Colorado Division of Labor with the determination of "adequate" minimum wages for workers in covered industries, including the "health and medical" industry.  *See* C.R.S. §§ 8-6-104, -106, -108.5; 7 C.C.R. 1103-1:1, -1:2(D). Accordingly, Colorado's overtime pay requirements (and the exemptions thereto) are established not by statute, but by a regulatory enactment of the Division of Labor known as the "Minimum Wage Order."  C.R.S. § 8-6-108.5(3); 7 C.C.R. 1103–1:1.  The current version of the Minimum Wage Order ("MWO"), Number 31, was promulgated in December of 2014.[7]  7 C.C.R. 1103–1:1.  Section 4 of the MWO requires employers pay their employees at a premium rate – one and a half times their regular wage – for any work in excess of 40 hours per work week, or in excess of 12 hours per workday.  7 C.C.R. 1103-1:4.  Section 5 of the MWO ("Section 5") provides certain exemptions to these overtime pay requirements:

> The following employees or occupations, as defined below, are exempt from all provisions of Minimum Wage Order No. 31: administrative, executive/supervisor, professional, outside sales employees, and elected officials and members of their staff.  **Other exemptions are: companions, casual babysitters, and domestic employees employed by households or family members to perform duties in private residences**, **property managers, interstate drivers, driver helpers, loaders or mechanics of motor carriers, taxi cab drivers, and bona fide volunteers.**  Also exempt are: students employed by sororities, fraternities, college clubs, or dormitories, and students employed in a work experience study program and employees working in laundries of

---

[7] Because some of Kennett's allegations date back to July of 2011, Minimum Wage Order No. 30, which governed from 2011 through December 31, 2014, also applies to her claims, while Minimum Wage Order No. 31 would apply to any claims from January 1, 2015 through the present.  Nevertheless, both MWO No. 30 and No. 31 contain the same language with respect to the Companion Exemption.  Accordingly, for ease of reference, the Court will refer to both of the applicable Minimum Wages Orders in the singular, as "the MWO".

> charitable institutions which pay no wages to workers and inmates, or
> patient workers who work in institutional laundries.

7 C.C.R. 1103-1:5 (emphasis added).  The Court will refer to this emphasized portion of

Section 5 as the "Companion Exemption."

Defendant bears the burden of demonstrating that a particular employee "plainly

and unmistakably" qualifies for an overtime exemption.  *See Chase v. Farmers Ins.*

*Exch.*, 129 P.3d 1011, 1014-15 (Colo. App. 2004) (noting that employers bear such a

burden under the Fair Labor Standards Act, and "[w]e perceive no reason why that

same burden should not be placed on an employer seeking to establish that an

employee falls within an exemption under Colorado law.")

The first step in determining whether the Companion Exemption applies to the

instant matter requires the Court to decide whether HHAs qualify as "companion"

employees.  Section 5 of the MWO specifically defines the terms "administrative

employee," "executive or supervisor," "professional," and "outside salesperson," but

does not define "companion."  *Id.; see also* 7 C.C.R. 1103-1.2 (providing definitions for

almost two dozen terms appearing in the MWO, but not for the terms "companion" or

"companionship services"); *Scott v. Home Instead, Inc.*, No. 14-CV-00833-MSK-CBS,

2014 WL 5812331, at *1 (D. Colo. Nov. 10, 2014) ("Neither the [Minimum Wage] Order

nor reported case authority defines the term 'companion.'")  Accordingly, the parties

point to the Colorado Division of Labor's "Advisory Bulletin and Resource Guide," dated

March 12, 2012, which provides the following definition of "companionship services":

> Companionship services may be **generally defined** in the following
> manner: **services which provide fellowship, care and protection for a**
> **person, who due to advanced age or physical or mental conditions**

> **cannot care for his or her own needs**.  Such services **may include** meal preparation, bed changing, washing of clothes, **and other similar services**. The companion performs the service for the aged or infirm person and not generally to other persons.

*Id.* at 70 (emphasis added).[8]  It is undisputed that Ms. Kennett and other HHAs employed by Bayada provided "care and protection for a person, who due to advanced age or physical or mental conditions cannot care for his or her own needs."  Plaintiff, however, asserts that Ms. Kennett and other HHAs were not "companions" because (1) they did not provide "fellowship" services (such as playing cards or board games with clients),[9] and (2) they provided relatively specialized medical services, including assistance with mobility, dressing, and personal hygiene (including bathing, toileting, and care relating to incontinence), as well as directing clients to take medication and monitoring oxygen and blood pressure levels.  In support of this more circumscribed definition of "companion," Plaintiff directs the Court to a webpage from the United States Department of Labor's ("DOL's") website, which appears to be a state-by-state survey conducted by the DOL of the various state "companion" exemptions.  This webpage states as follows:

> **Colorado's definition of "companion" is much narrower than the FLSA definition.  Companions may not help to bathe and dress the person, do any amount of housekeeping, or remind the person to**

---

[8] This document is available at
https://www.colorado.gov/pacific/sites/default/files/Advisory%20Bulletins.pdf (last visited 9/23/2015).

[9] Specifically, Kennett alleges that she did not provide so-called "fellowship" services for Bayada's clients – for example, playing cards or board games, reading books, listening to music, doing errands outside the home, or grocery shopping.  (Doc. # 32, ¶ 13.)  Defendant does not dispute this fact, but does "dispute . . . that its other Homecare Workers do not engage in such [fellowship] activities."  (Doc. # 35 at 3.)

> **take medication. People who do those tasks are more than just**
> **"companions" they are "personal care" attendants.** Personal care
> attendants are entitled to minimum wage and overtime.  However, PCAs
> employed directly by private households are exempt from minimum wage
> and overtime.  Colorado Minimum Wage Order No. 26 § 5; 7 Colo. Code
> Regs. § 1103-1:5.

(Doc. # 32-6 at 19) (emphasis added).  Defendants counter that this document does not

have the force of law, and that it is also incorrect as a matter of law, because Colorado's

exemption does not actually contain a definition of "companion" – either in the specific

statutory provisions cited by the DOL or elsewhere – from which the DOL could derive a

"rule" that "Colorado's definition of 'companion' is much narrower than the FLSA

definition" or that "[c]ompanions may not help to bathe or dress the person, do any

amount of housekeeping, or remind the person to take medication."

The Court agrees.  This informal DOL analysis of Colorado law represents, at

best, persuasive authority.  The Court is not persuaded by it in any event, as its

statutory citations do not support its rather sweeping conclusions.  Regardless, the

Court will not defer to the DOL's interpretation of state law given the existence of an

interpretation promulgated by the state's own Division of Labor in its "Advisory Bulletin

and Resource Guide."  That document provides that "companion" services are

"**generally** defined" as "services which provide fellowship, care and protection for a

person, who due to advanced age or physical or mental conditions cannot care for his

or her own needs," and "**may** include" things such as "meal preparation, bed changing,

[and] washing of clothes," as well as "**other similar** services."  Although HHAs do

perform some quasi-medical tasks, such as changing a bedpan or a brief for an

incontinent client, or transferring a client from a bed to a wheelchair, HHAs are not

permitted to directly administer medication, nor to perform the tasks requiring

specialized medical training that are typically performed by LPNs or RNs (such as

changing a catheter or an IV).  As such, the Court concludes that the other services

HHAs provide are similar enough to "meal preparation, bed changing [and] washing of

clothes" to fit within the "other similar services" catchall category.  Consequently, HHAs

qualify as "companions" for purposes of the exemption.

The Court must next determine whether the Companion Exemption is applicable

to the HHAs in the instant case.  The MWO is a state regulatory enactment;

consequently, the Court applies Colorado rules of construction in deciphering its

meaning.  *See Salazar v. Butterball, LLC*, 644 F.3d 1130, 1143 (10th Cir. 2011)

(applying Colorado state rules of construction in interpreting Colorado Minimum Wage

Order).  The Companion Exemption reads, in relevant part, as follows:

> The following employees or occupations, as defined below, are exempt
> from all provisions of Minimum Wage Order No. 31: administrative,
> executive/supervisor, professional, outside sales employees, and elected
> officials and members of their staff.  **Other exemptions are:
> companions, casual babysitters, <u>and</u> domestic employees employed
> by households or family members to perform duties in private
> residences**, property managers, interstate drivers, driver helpers, loaders
> or mechanics of motor carriers, taxi cab drivers, <u>**and**</u> bona fide volunteers.

7 C.C.R. 1103-1:5 (emphasis added).  The gravamen of the parties' dispute turns on

whether the phrase "employed by households or family members to perform duties in

private residences" – to which the Court will hereinafter refer as the "household

qualifier" – solely modifies "domestic employees," or if it also modifies the other two

occupational categories (i.e., companions and casual babysitters).

Plaintiff argues that because the phrase "companions, casual babysitters, and domestic employees" is conjunctive (as all three occupational categories are joined by the word "and"), the **entire phrase**, including the word "companions," is modified by the household qualifier.  Because Ms. Kennett and other HHAs were employed by Bayada, a third-party employer – not by a household or family member – Plaintiff thus contends that the Companion Exemption does not apply in the instant case.  Defendant counters that the household qualifier applies exclusively to the term immediately preceding it ("domestic employees"), such that it does not modify either "casual babysitters" **or** "companions."  Specifically, Defendant argues that "each listed occupational category is disjunctive," by virtue of the fact that Section 5 provides for "occupational" exemptions and each occupation is separated by a comma.  According to Defendant's reading, then, "companions" like Ms. Kennett are not required to be employed by a household or family member to qualify for the exemption.

In examining a statute,[10] the Court's ultimate aim is to give effect to the intent of the legislature, and in doing so, looks to the language of the statute – reading words and phrases in context, giving effect to every word and rendering none superfluous, construing text according to the rules of grammar, and avoiding strained or forced interpretations.  *Jefferson Yellow Jacket Water Conservancy Dist. v. Livingston*, 2013 CO 73, ¶ 9 (internal citation omitted); *People v. Lovato*, 2014 COA 113, ¶ 21; *Carlson v.*

---

[10] The Court recognizes that the MWO is not a statute; however, Defendant cites no authority, nor is the Court aware of any, indicating that the **plain language** of a regulatory enactment should be interpreted in a different fashion from that of a statute.  Whether the agency's interpretation of its own statute is entitled to deference is a separate question, also addressed below.

*Ferris*, 85 P.3d 504, 509 (Colo. 2003); *see also People v. Lassek*, 122 P.3d 1029, 1033

(Colo. App. 2005) (holding that the "grammatical structure of the statute" mandated a

specific construction).  Defendant's reading of the Companion Exemption, however, fails

to account for its grammatical structure; specifically, it fails to account for (1) the

placement of commas after the terms "companions" and "casual babysitters," and (2)

the fact that the word "and" appears immediately **before** "domestic employees."

Moreover, if the household qualifier were interpreted to modify "domestic employees"

**exclusively**, this "and" – appearing in the top-third of the list of occupations – would be

either superfluous or nonsensical, particularly because the only other "and" appearing in

the phrase at issue appears at the very end of the sentence.  To put it slightly

differently, if Defendant's interpretation were to prevail, the Companion Exemption

would require an additional "and" (but no comma) between "companions" and

"babysitters": "Other exemptions are: companions **and** casual babysitters, **and** domestic

employees employed by households or family members to perform duties in private

residences . . . ."  However, even this reading is strained, given that the remaining

occupations listed are separated by commas, not by the word "and" ("property

managers, interstate drivers, driver helpers, loaders or mechanics of motor carriers, taxi

cab drivers, and bona fide volunteers.")  The only grammatically sound reading of the

statute, then, dictates that the household qualifier is equally applicable to the

antecedents "companions" and "casual babysitters" as it is to "domestic employees."

The Court's interpretation is bolstered by the well-established canon of statutory

construction that "[w]hen a referential or qualifying clause follows several words or

phrases and is applicable as much to the first word or phrase as to the others in the list,

. . . the clause should be applied to all of the words or phrases that preceded it." *Estate of David v. Snelson*, 776 P.2d 813, 818 (Colo. 1989) (citing 2A N. Singer, Statutes and Statutory Construction § 47.33, at 245 (4th ed. 1984)).  Significantly, the qualifying phrase here (i.e., household qualifier), is as applicable to the occupational categories "companion" and "casual babysitter" as it is to "domestic employee" – indeed, companion services and casual babysitting, like domestic services, are typically performed in private homes, and can involve (but need not involve) direct employment by a household or a family member.  In *Estate of David*, the Colorado Supreme Court applied this canon and held that the qualifying phrase "under the laws of this state or of any other jurisdiction" modified "a final decree of adoption" in addition to "an order terminating the parent-child relationship," in the following statutory phrase:

> An adopted person is the child of an adopting parent . . . except to the extent that inheritance rights have been divested by a final order of relinquishment, **a final decree of adoption**, or **an order terminating the parent-child relationship under the laws of this state or of any other jurisdiction**.

776 P.2d at 818 (emphasis added).  Similarly, the Colorado Court of Appeals applied this canon in *People in Interest of M.W.*, 796 P.2d 66, 68 (Colo. App. 1990), and held that the phrase, "to the degree necessary to adequately represent the child," applied to all of the preceding duties itemized for a guardian ad litem, not just to the guardian ad litem's duty to "participate further in the proceedings," in the following statutory provision:

> [The Guardian Ad Litem] shall make such further investigations as he deems necessary to ascertain the facts and shall talk with or observe the

child involved, examine and cross-examine witnesses in both the adjudicatory and dispositional hearings, introduce and examine his own witnesses, make recommendations to the court concerning the child's welfare, appeal matters to the court of appeals or the supreme court, **and** participate further in the proceedings **to the degree necessary to adequately represent the child.**

*Id.* (emphasis added).

However, Defendant still has a few arrows in its argumentative quiver.  The first and strongest arrow is an August 3, 2006 "Opinion Letter" ("the Opinion Letter"), written by then-Director of the Division of Labor, Michael J. McArdle, and promulgated in response to an inquiry by a private litigant.  The Opinion Letter states in pertinent part that:

It is the belief of the Division [of Labor] that the treatment and interpretation of the companions exemption in the Wage Order was intended to the [sic] mirror the companions [sic] definition and associated regulations contained in federal law; this position has remained unchanged by the Division since the promulgation of Wage Order 22 in 1998. . . . **[I]t is the Division's enforcement policy that the practice of applying the companionship exemption in situations involving third party employers is acceptable under Colorado Minimum Wage Order Number 22.**

For a definition of companions and companionship services for the purposes of the Wage Order, the division refers to the U.S. Department of Labor's regulations, 29 C.F.R. § 552.6 . . .

The Division also refers to the U.S. Department of Labor regulations in regards to companions and third party employers for purposes of the Wage Order.  29 C.F.R. 552.109(a) provides the following:

Employees who are engaged in providing companionship services, as defined in § 552.6, and who are employed by an employer or agency other than the family or household using their services, are exempt from the Act's minimum wage and overtime pay requirements by virtue of section [213(a)(15)].  Assigning such an employee to more than one household or family in the same workweek would not defeat the exemption for that workweek,

> provided that the services rendered during each assignment come within the definition of companionship services.
>
> . . .
>
> *This position of the Division is based upon the case-specific information provided and does not necessarily generalize to other contexts or situations.  Statements and conclusions expressed herein may change depending upon the inclusion or exclusion of additional facts or background information.  The position of the Division may also change over time. This position is not legal advice, and the opinion of attorneys and the judicial system may differ.

(Doc. # 29-6 at 2-3) (emphasis added).

The interpretation of a regulation by an agency charged with its enforcement is ordinarily accorded deference; accordingly, a court will "generally accept" an agency's interpretation if it has a "reasonable basis in law."  *Stell v. Boulder Cnty. Dep't of Soc. Servs.*, 92 P.3d 910, 915–16 (Colo. 2004).  However, an interpretation that is inconsistent with the plain meaning of the regulation is not entitled to such deference, and a court "may reject an agency's interpretation of its regulations if the language of the regulation compels a different meaning."  *Rags Over the Arkansas River, Inc. v. Parks*, 2015 COA 11M, ¶ 27; *see also Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. Colorado Pub. Utilities Comm'n*, 157 P.3d 1083, 1089 (Colo. 2007) (noting that "deference would not be appropriate if the [agency's] statutory interpretation . . . is contrary to the plain meaning of the statute"); *Three Bells Ranch Associates v. Cache La Poudre Water Users Ass'n*, 758 P.2d 164, 172 (Colo. 1988) (noting that a court "need not defer to administrative interpretation when . . . the statutory language is so clear as to compel the contrary result"); *El Paso Cnty. Bd. of Equalization v. Craddock*, 850 P.2d 702, 704–05 (Colo. 1993) ("Courts, of course, must interpret the law and are

not bound by an agency decision that misapplies or misconstrues the law."); Colo. Rev. Stat. § 24-4-106(7) (providing that a court shall not sustain agency actions which are "contrary to law").  Indeed, where a regulation plainly requires a different interpretation, "[t]o defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation."  *Rags Over the Arkansas River, Inc.*, ¶ 27.

Additionally, although opinion letters are issued by administrative agencies, they are not binding authority and do not **require** deference.  *See Banner Advertising, Inc. v. People*, 868 P.2d 1077, 1083 (Colo. 1994) (noting that an opinion letter was "in no way binding on a court" because the opinion therein was "not reached as a result of hearing adversary proceedings in which [the agency] found facts and reached conclusions of law," but could serve as "persuasive authority").  Rather, such letters may serve as "guidance" and "persuasive authority" and are entitled to the deference that the agency earns in its analysis – based on the thoroughness of the evaluation, the validity of the reasoning, and any other factors which a court finds relevant.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *McGraw v. Barnhart*, 450 F.3d 493, 501 (10th Cir. 2006) ("Under *Skidmore*, the degree of deference given informal agency interpretations will vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."); *Arapahoe Cnty. Pub. Airport Auth. v. Centennial Exp. Airlines, Inc.*, 956 P.2d 587, 592 (Colo. 1998) (concluding that an opinion letter issued by the United States Department of Transportation regarding the issue of federal preemption was not

entitled to deference because it was "brief," "contained no [relevant] analysis," and failed

to cite cases for its legal conclusions).

Defendant argues that the interpretation of the Companion Exemption set forth in

the Opinion Letter is entitled to "substantial deference" and "must" be applied to the

instant case, particularly because it represents the Division of Labor's (Division's)

interpretation of its own regulation and statutory scheme.  (Doc. # 30 at 8-9.)  Plaintiff

counters that the Court should not defer to the Opinion Letter because it is disclaimer-

riddled, contains no relevant analysis, and – most significantly – is contrary to the

Companion Exemption's plain language.  (Doc. # 35 at 15-16.)

Plaintiff has the better argument.  Much like the opinion letter in *Arapahoe*

*County Public Airport Authority,* 956 P.2d 592, the Opinion Letter does not warrant

deference, both because it is conclusory and because it contains no actual discussion

of the MWO's terms.  In particular, it utterly fails to acknowledge, much less discuss, the

fact that the Companion Exemption contains a household qualifier.[11]  The Division did

not even attempt to justify (much less **reasonably** justify) its "belief" that the Companion

Exemption should "mirror" federal law, nor to square the grammatically correct reading

of the statute with such a belief.  As such, the Court will not defer to the Opinion Letter,

because, as discussed above, "the language of the regulation compels a different

meaning."  *See Rags Over the Arkansas River, Inc.*, 2015 COA ¶ 27.  Moreover, the

Opinion Letter's conclusions were not reached after the Division made any sort of

factual findings; indeed, it contains strongly-worded disclaimers about whether it should

---

[11] Additionally, the Opinion Letter's abundance of typographical mistakes indicates the relative
lack of care and formality in its issuance.

be relied upon at all – even by the parties who requested it.  In particular, it explicitly

notes that it does not constitute legal advice, that the opinion of the "judicial system"

may differ, and that it is "based upon the case-specific information provided and does

not necessarily generalize to other contexts or situations" such that "[s]tatements and

conclusions expressed herein may change depending upon the inclusion or exclusion of

additional facts or background information."  (Doc. # 29-6 at 2-3.)   In sum, because the

Opinion letter was conclusory, contrary to the plain meaning of the Companion

Exemption, and disclaimer-riddled, this Court will not defer to its interpretation.

Lastly, Defendant argues that even if the Court construes the Companion

Exemption as requiring HHAs to be employed directly by a household or family, Bayada

**still** qualifies for the exemption because HHAs are "jointly" or "specially" employed by

both Bayada and by Bayada's clients (i.e., by the households and families to which the

exemption refers).  (Doc. # 30 at 4.)  Defendant refers to the MWO's extremely broad,

bare-bones definition of "employer" ("every person . . . employing any person in

Colorado"), 7 C.C.R. 1103–1:2, and asserts that Bayada's clients should also be

considered employers of the HHAs because clients (1) were, "at all times," able to

refuse the employment of an HHA "for any reason"; (2) "frequently" interviewed

homecare workers before Bayada could assign them to the client's homes; (3) provided

their own supplies; (4) directed and controlled HHA performance, including what specific

services on their Care Plan were to be provided and when such services were to be

provided; and (5) "had control over" what an HHA could or could not wear.  (Doc. # 30

at 23.)  Defendant also asserts that HHAs meet the definition of "special" or "dual"

employment outlined in *Evans v. Webster*, 832 P.2d 951 (Colo. App. 1991).  In *Evans*, the Colorado Court of Appeals held that a "personal attendant" who performed personal services for a consumer pursuant to a contract between that consumer and a third-party agency was a "dual" or "special" employee of the consumer, in addition to being the employee of the agency; as such, the personal attendant was barred from seeking separate tort damages against the consumer for injuries that occurred at the consumer's home and was limited to the recovery under the workers' compensation system.  *Id.* at 956.  That court stated that a special employment relationship is "deemed to exist whenever an employer **provisionally assigns to another employer the services of an employee who thereby surrenders to the borrowing employer the right of control over the employee's actions** . . . [and] allows an employee to be simultaneously in the general employment of one employer and in the special employment of another, **provided the employee understands that he or she is submitting to the control of the special employer**."  *Id.* at 944 (emphasis added). Additionally, it provided a list of nine criteria which it considered "relevant" in the determination of whether a "special employment" relationship exists, including:

> (1) whether the borrowing employer has the right to control the employee's conduct; (2) whether the employee is performing the borrowing employer's work; (3) whether there was an agreement between the original and borrowing employer; (4) whether the employee has acquiesced in the arrangement; (5) whether the borrowing employer had the right to terminate the employee; (6) whether the borrowing employer furnished the tools and place for performance; (7) whether the new employment was to be for a considerable length of time; (8) whether the borrowing employer had the obligation to pay the employee; and (9) whether the original employer terminated its relationship with the employee.

*Id.* at 955 (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969); 1C A. Larson

*Workmen's Compensation Law* § 48.00, et seq. (1990)). "Of the nine factors,

number four, the consent of the employee, is of critical importance, and, when

coupled with element one, control over the work activities of the employee and

element five, the concomitant power to terminate the relationship, would seem to

be decisive." *Id.*

The Court is not persuaded that the "special employment" doctrine applies here.

Even assuming, *arguendo*, that the doctrine applies outside of the worker's

compensation context,[12] it makes little sense to characterize Bayada's clients as

"borrowing" HHAs from Bayada, or to say that HHAs "consented" or "acquiesced" to

providing services to Bayada's clients. Indeed, far from "surrendering control" over its

HHA employees, Bayada structured the entire relationship between the HHAs and

Bayada's clients and **continued to do so** throughout the duration of the relationship.

*See Ruiz*, 413 F.2d at 313 (emphasis added) ("Implicit in the borrowed-servant

conception, . . . is **temporary termination by the general employer** of its relationship

with the servant.") Defendant notes that HHAs performed work in client's homes, and

thus were not directly supervised on a daily basis by a Bayada employee. However,

Bayada still ensured that it maintained effective control over the HHAs – from dictating

what they wore to work and the length of their fingernails, to setting forth the (relatively

---

[12] The Court has found no Colorado authority applying the doctrine outside of this context (such as in the employment discrimination arena), and notes that the criteria cited in *Evans* are derived from a Worker's Compensation treatise and a Fifth Circuit case involving an injured maritime employee and whether that employee's "exclusive remedy would be for workmen's compensation rather than damages in tort." *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 311 (5th Cir. 1969).

limited) services HHAs could perform (services neither HHAs nor clients could change without prior permission from the Clinical Manager), and evaluating HHAs on a monthly and annual basis.  Accordingly, the fact that Bayada's clients could exercise control at the margins – for instance, by choosing which services they desired from a pre-selected menu of options, or by directing the time of day that such services were performed – is immaterial.  *See id.* (internal citation omitted) (noting that in considering whether the power exists to control and direct an employee, "a careful distinction must be made 'between authoritative direction and control, and mere suggestion as to details or the necessary co-operation'").

Similarly, although Bayada's clients could request a different HHA "at any time" and "for any reason"[13], they did not have the power to **terminate** an HHA from employment with Bayada.  Rather, if a client made such a request, the HHA was not fired; rather, if the HHA were not reassigned to a new client, Bayada would still have to take affirmative steps to terminate the HHA.  That Bayada – not its clients – created, maintained, and controlled all employment paperwork for HHAs, paid the HHAs, and also required HHAs to agree to a non-compete clause as a condition of employment, is also significant and indicative of the fact that Bayada very much treated HHAs as its own employees.  *Compare Evans*, 832 P.2d at 954 (noting that "the agreement

---

[13] Even though Colorado is an at-will employment state, it is notable that an employer's right to fire an employee "for any reason" is limited by the employee's right not to be discriminated against illegally and by the employer's obligations to offer equal employment opportunities under applicable federal and state discrimination laws and regulations.  That Bayada's clients could request that their HHA be reassigned "for any reason" – including, for example, racial, sexual, or religious discrimination – also indicates that the clients were not, in fact, "employers" of the HHA.

[between the home health attendant and the third-party employer] did not prohibit the aide from becoming [the third-party employer's] employee, nor did it give [the third-party employer] the right to replace or reassign the aide.")

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that (1) the Companion Exemption does not apply to bar Ms. Kennett from seeking unpaid overtime wages, notwithstanding the Division of Labor's Opinion Letter, and (2) HHAs were not "jointly employed" by Bayada and Bayada's clients for purposes of the MWO.  As such, Defendant's Motion for Summary Judgment (Doc. # 29) is hereby DENIED, and Plaintiff's Cross-Motion for Summary Judgment on Defendant's Exemption Defense (Doc. # 31) is hereby GRANTED.

DATED:  September 24, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge